UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 19-20858-CV-MOORE
MAGISTRATE JUDGE REID

PHILLIP DAVIS,

      Petitioner,

v.

MARK S. INCH,

      Respondent.

_____/

## REPORT OF MAGISTRATE JUDGE RE
## FEDERAL HABEAS CORPUS PETITION - 28 U.S.C. § 2254

### I. Introduction

Petitioner, **Phillip Davis**, has filed a *pro se* Amended Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254, attacking the constitutionality of his convictions for one count of organized scheme to defraud, one count of aggravated white collar crime, two counts of grand theft of $20,000 but less than $100,000, and five counts of money laundering entered following a jury verdict in Miami-Dade County Circuit Court, **Case No. F05-**31344A. [ECF No. 22]. This case has been referred to the Undersigned pursuant to 28 U.S.C. §§ 636(b)(1)(B), (C) and S.D. Fla. Admin. Order 2019-02. [ECF No. 2].

The Undersigned has reviewed the record, including the Amended Petition [ECF No. 22], the Response with supporting appendix [ECF No. 28], and Petitioner's Reply [ECF No. 29]. For the following reasons, the Amended Petition should be **DENIED**.

1

## II. Claims

Construing the arguments liberally pursuant to *Haines v. Kerner,* 404 U.S. 419, 520-21 (1972) (*per curiam*), Petitioner raises six grounds for relief, five challenging counsel's effectiveness and one of trial court error, as follows:

1.  Trial counsel failed to move to disqualify Miami-Dade County Circuit Court Judge Beatrice Butchko, the judge who presided over Petitioner's trial, on the basis of bias, which resulted in a violation of Petitioner's right to a fair trial. [ECF No. 22 at 4].

2.  Appellate counsel was ineffective for failing to argue on appeal that Count 2 of the Information was fatally defective in that it did not charge a crime, so Petitioner is actually innocent as to Count 2. [*Id*. at 7].

3.  Trial counsel failed to seek dismissal of Count 2 on the basis that it was fatally defective because it did not charge a crime. [*Id*. at 12].

4.  Trial counsel failed to retain and call an expert forensic accountant to testify at trial to rebut the state's expert and evidence, in light of Petitioner's actual innocence. [*Id*. at 13].

5.  Trial counsel failed to request a good faith defense instruction. [*Id*. at 17].

6.  The trial court erred in denying Petitioner's motion to disqualify Miami-Dade Circuit Court Judge Milton Hirsch, the post-conviction judge presiding over Petitioner's Fla. R. Crim. P. 3.850 Motion, on the basis that the judge was biased. [*Id*. at 18].

## III. Procedural Background

A.  Petitioner's Conviction and Appeal

Petitioner was found guilty, following a jury trial, of an organized scheme to defraud, in the aggregate value of $50,000 or more, in violation of Fla. Stat. §§ 777.034(4)(A) and 777.01 (Count 1); aggravated white collar crime, in violation of Fla. Stat. §§ 777.0844(5) and 777.011 (Count 2); two counts of grand theft of more than $20,000, but less than $100,000, in violation of Fla. Stat. §§ 812.014(2) and 777.011 (Counts 3, 4); and five counts of money laundering, in

violation of Fla. Stat. §§ 896.101(3), (5)(A) and 777.011 (Counts 6-10). [ECF No. 28-2, Ex. D at 124-55; ECF No. 28-3, Ex. E at 2-4]. He was adjudicated guilty and sentenced to a total term of twenty years of imprisonment, with sentences suspended on all counts, except Count 2, and ten years of probation. [ECF No. 28-3, Ex. E at 2-4; ECF No. 28-4, Ex. F at 6-7].

Petitioner's conviction arose from an investigation which revealed Petitioner had engaged in an organized scheme to defraud and had committed grand theft of grant money received from the Miami-Dade Housing Agency to fund a company he operated.[1]

Petitioner appealed, raising five claims of trial court error. [ECF No. 28-3, Ex. H at 11-56]. The Third District Court of Appeal affirmed the convictions and sentences in a published, written opinion. *See Davis v. State,* 126 So. 3d 357 (Fla. 3rd DCA 2013), [ECF No. 28-3, Ex. K at 133]. Rehearing was denied on **June 11, 2013.** [ECF No. 28-3, Ex. M. at 155]. Discretionary review was denied by the Florida Supreme Court on **October 11, 2013** in a written, but unpublished opinion**.** *See Davis v. State,* 129 So. 3d 1067 (Fla. 2013), [ECF No. 28-4, Ex. Q at 35]. His conviction became final on **January 9, 2014,** when the ninety-day period for seeking certiorari at the United States Supreme Court expired. *See Gonzalez v. Thaler,* 565 U.S. 134, 149-50 (2012).

B. Post-conviction Motions

Petitioner filed a state petition for writ of habeas corpus raising **claim 2** of this federal petition on **May 3, 2014.**[2] [ECF No. 28-4, Ex. S at 52-76]. The Third District Court of Appeal summarily denied the petition in an unpublished opinion. *See Davis v. State,* 58 So. 3d 588 (Fla.

---

[1] References in this Report to the trial, status conference, and Rule 3.850 Motion hearing transcripts, filed on CM/ECF at ECF No. 28, are noted with the letters "T" and the page number of the transcript and not that of the Court's electronic docketing system.

[2] Because Respondent has conceded that this case is timely, only the proceedings relevant to the claims raised are discussed in the procedural history.

3

3rd DCA 2014), [ECF No. 28-4, Ex. T at 84]. Rehearing and rehearing *en banc* were denied on **July 29, 2014.** [ECF No. 28-5, Ex. V at 2].

Next, in January 2015, Petitioner filed his first motion pursuant to Fla. R. Crim. P. 3.850 ("Rule 3.850 Motion"), raising multiple claims, including **claims 1, 3, 4, and 5**. [ECF No. 28-5, Ex. W at 4-52]. He filed an Amended Rule 3.850 Motion relating to **claim 4**. [ECF No. 28-5, Ex. Y at 118-32]. Orders were entered summarily denying claims 1, 3, and 5, and following two evidentiary hearings, a final order was entered denying, in pertinent part, claim 4. [ECF Nos. 28-5, Ex. X at 99-116; Ex. Z at 134-37; ECF No. 28-7, Ex. BB at 2-19].

In the interim, prior to the Rule 3.850 evidentiary hearing, Petitioner filed a motion raising **claim 6**, in which he sought to disqualify Miami-Dade County Circuit Court Judge Milton Hirsch from continuing to preside over his Rule 3.850 proceeding. [ECF No. 28-6, Ex. AA at 2-11]. The motion was denied at a December 15, 2015 hearing. [ECF No. 28-22 at 1-79].

Petitioner appealed the denial of his Rule 3.850 motions and the denial of his motion to disqualify Judge Hirsch. [ECF No. 28-8, Ex. DD at 5-61]. On **February 27, 2019,** the Third District Court of Appeal *per curiam* affirmed the denials, citing *Strickland v. Washington,* 466 U.S. 668, 687 (1984) and other state court cases regarding imperfections in a charging instrument. *See Davis v. Florida,* 271 So. 3d 96 (Fla. 3rd DCA 2019) (*per curiam*), [ECF No. 28-8, Ex. GG at 141-42]. The proceeding concluded when the mandate issued on **March 19, 2019.** [ECF No. 28-8, Ex. HH at 143].

Before the above Rule 3.850 proceedings concluded, Petitioner filed his initial § 2254 Petition in this Court on **February 28, 2019**. [ECF No. 1 at 1] and, less than a week later, filed an Amended Petition on **March 5, 2019.** [ECF No. 9: 1]. After requesting and being granted permission to file another amendment, subject to application of *Davenport v. United States,* 217

4

F.3d 1341, 1344 (11th Cir. 2000)[3] and other procedural bars and defenses, Petitioner filed his operative, Second Amended Petition, raising **claims 1 through 6,** as listed above. [ECF No. 22 at 1]. The claims raised in this Amended Petition relate back to his earlier petition.

### IV. Threshold Issues - Timeliness and Exhaustion

#### A. Timeliness

Respondent concedes the Petition is timely because there was less than one-year of untolled time during which no post-conviction proceedings were pending from the time Petitioner's conviction became final and the filing of this case. [ECF No. 28 at 18].

#### B. Exhaustion

Respondent also concedes correctly that **claims 1 through 6** have been properly exhausted in the state courts, having been raised in the Rule 3.850 proceeding, the state habeas corpus proceeding, and/or a post-conviction motion to disqualify the presiding judge. [ECF No. 28 at 21, 24, 27, 30, 33]. Because the claims raised in this federal petition were raised to the state's highest court, either in a state habeas corpus petition, a Rule 3.850 proceeding and appeal therefrom, or a motion to disqualify his post-conviction judge and an appeal therefrom, the claims are properly exhausted and ripe for federal habeas corpus review. *See Preston v. Sec'y, Fla. Dep't of Corr.*, 785 F.3d 449, 456–59 (11th Cir. 2015) (citations omitted).

---

[3] Under Fed. R. Civ. P. 15(c), "[a]n amendment of a pleading relates back to the date of the original pleading when . . . the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out -- or attempted to be set out -- in the original pleading." Fed. R. Civ. P. 15(c)(1)(B). In *Davenport,* the Eleventh Circuit made clear that for a claim to relate back, "the untimely claim must have arisen from the same set of facts as the timely filed claim, not from separate conduct or a separate occurrence in both time and type." 217 F.3d at 1344 (internal citations and quotations omitted).

## V. Governing Legal Principles

### A. Standard of Review

The Court is bound by the Antiterrorism and Effective Death Penalty Act ("AEDPA") which requires the Court use a "highly deferential standard for evaluating state-court rulings and demands that [they] be given the benefit of the doubt." *Renico v. Lett,* 559 U.S. 766, 773 (2010) (quotation marks and citation omitted); *see also Lee v. Comm'r, Ala., Dep't of Corr.*, 726 F.3d 1172, 1192 (11th Cir. 2013) (citations omitted). Deferential review under § 2254(d) is generally limited to the record that was before the state court that adjudicated the claim on the merits. *See Cullen v. Pinholster,* 563 U.S. 170, 181 (2011); *see also Griffin v. Sec'y, Dep't of Corr.,* 787 F. App'x 564, 567 (11th Cir. 2019) (citing *Cullen,* 563 U.S. at 181).

The Court may not grant relief on any claim adjudicated on the merits in state court unless the state court's decision (1) "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States;" or (2) "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); *see also Harrington v. Richter,* 562 U.S. 86, 98 (2011) (quoting § 2254(d)); *Rimmer v. Sec'y, Fla. Dep't of Corr.,* 876 F.3d 1039, 1053 (11th Cir. 2017) (accord).

A state court decision is "contrary to" clearly established federal law if it applies a rule that contradicts the governing law set forth by the United States Supreme Court, or arrives at a result that differs from Supreme Court precedent when faced with materially indistinguishable facts. *See id.* (quoting *Bell v. Cone,* 535 U.S. 685, 694 (2002))."A state court decision involves an 'unreasonable application' of clearly established federal law 'if the state court correctly identifies the governing legal principle' from the relevant Supreme Court decisions 'but unreasonably

applies it to the facts of the particular case.'" *Id.* (quoting *Bell,* 535 U.S. at 694); *see also Williams v. Taylor,* 529 U.S. 362, 413 (2000).

Section 2254(e)(1) requires the Court to presume the state court's factual determinations are correct. It is well settled that Petitioner bears the burden of establishing his right to federal habeas corpus relief and proving all of the facts necessary to demonstrate a constitutional violation. *See Fillmore v. Perry,* 163 F. App'x 819, 820 (11th Cir. 2006) (*per curiam*) (citing *Romine v. Head,* 253 F.3d 1349, 1357 (11th Cir. 2001)).

### B. Ineffective Assistance of Counsel Principles

**Claims 1 through 5** challenge counsel's effectiveness, which is governed by the Supreme Court's two-pronged test announced in *Strickland v. Washington*, 466 U.S. 668 (1984). The Sixth Amendment to the United States Constitution guarantees criminal defendants the right to the assistance of counsel during criminal proceedings against them. *See id.* at 684–85. When assessing counsel's performance under *Strickland,* the court employs a strong presumption that counsel "rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id.* at 690. Petitioner must provide factual support for his contentions regarding counsel's performance. *See Smith v. White,* 815 F.2d 1401, 1406–07 (11th Cir. 1987). Bare, conclusory allegations of ineffective assistance are insufficient to satisfy the *Strickland* test. *See Boyd v. Comm'r, Ala. Dep't of Corr.,* 697 F.3d 1320, 1333–34 (11th Cir. 2012).

"[T]he Sixth Amendment does not guarantee the right to perfect counsel; it promises only the right to effective assistance. . ." *Burt v. Titlow,* 571 U.S. 12, 20 (2013). "Where the highly deferential standards mandated by *Strickland* and the AEDPA both apply, they combine to produce a doubly deferential form of review that asks only 'whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard.'" *Gissendaner v. Seaboldt,* 735 F.3d 1311,

1323 (11th Cir. 2013) (quoting *Harrington,* 562 U.S. at 105).

To prevail on a claim of ineffective assistance of counsel, a petitioner must demonstrate that: (1) his counsel's performance was deficient, falling below an objective standard of reasonableness; and, (2) he suffered prejudice resulting from that deficiency. *See Strickland,* 466 U.S. at 687-88. Strategic choices made after thorough investigation of the law and facts relevant to plausible options are virtually unchallengeable. *See id.* at 690-91. To uphold a lawyer's strategy, a court need not attempt to divine the lawyer's mental processes underlying the strategy, because there are "countless ways to provide effective assistance in any given case." *Id.* at 689. No lawyer can be expected to have considered all those ways. *See Chandler v. United States,* 218 F.3d 1305, 1316 (11th Cir. 2000).

To establish deficient performance, Petitioner must show that, in light of all circumstances, counsel's performance was outside the wide range of professional competence. *See Strickland, supra.*; *see also Cummings v. Sec'y for Dep't of Corr.,* 588 F.3d 1331, 1356 (11th Cir. 2009). The Court's review of counsel's performance should focus on "not what is possible or what is prudent or appropriate but only [on] what is constitutionally compelled." *Chandler,* 218 F.3d at 1313*; see also Burger v. Kemp,* 483 U.S. 776 (1987). Counsel is not ineffective for failing to raise non-meritorious issues, *see Chandler v. Moore,* 240 F.3d 907, 917 (11th Cir. 2001), nor is counsel required to present every non-frivolous argument. *See Dell v. United States,* 710 F.3d 1267, 1282 (11th Cir. 2013) (*citing Chandler,* 281 F.3d at 1318).

Regarding the prejudice component, the Supreme Court has explained "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland,* 466 U.S. at 694. A reasonable probability is "a probability sufficient to undermine confidence in the outcome." *Id.* at 694. The

8

Court need not address both prongs of *Strickland* if the defendant makes an insufficient showing on one of the prongs. *See id.* at 697; *see also Brown v. United States,* 720 F.3d 1316, 1326 (11th Cir. 2013) (citations omitted).

## V. Discussion

## A. Ineffective Assistance of Counsel Claims

1. <u>Failure to Seek Disqualification of Trial Court Judge</u>

In **claim 1,** Petitioner asserts that trial counsel failed to file a pre-trial motion to disqualify the trial judge, Judge Butchko, for bias resulting in the denial of Petitioner's right to a fair trial. [ECF No. 1 at 4]. Upon learning that Judge Butchko would preside over his trial, Petitioner claims he repeatedly told counsel he feared she would demonstrate personal prejudice or bias because Petitioner "was a former circuit court judge sitting in the same circuit" where his case was to be tried, and he had "had animus encounters" with "Judge Butchko's friend and co-worker, Ann Marie Antonacci," ("Attorney Antonacci") a former assistant state attorney, when they both worked at the Miami-Dade State Attorney's Office. [*Id.*].

Specifically, Petitioner states he had "bitter personal and professional encounters" with Attorney Antonacci when she worked for the state attorney's office, and claims Judge Butchko, who at the time was an assistant state attorney or certified legal intern, witnessed or was present during these incidents. [*Id.* at 5]. Petitioner claims these encounters with Attorney Antonacci occurred when he was a criminal defense attorney and later when he became a judge. [*Id.*].

He further explains he had previously been prosecuted in federal court, on corruption charges, along with four other Miami-Dade County Circuit Court judges, from 1991 to 1993, in what became known as "Operation Court Broom." [*Id.*]. According to Petitioner, he was the only defendant who was acquitted by the jury of all charges. [*Id.*].

9

As a result, Petitioner maintains the Miami-Dade State Attorney at the time moved to recuse its office and petitioned the Florida Governor for appointment of a special prosecutor. [*Id.*]. The request was granted, and an Executive Order was entered appointing the Broward State Attorney's Office to prosecute Petitioner on state court charges. [*Id.* at 4-5].

Petitioner claims he also advised counsel he "believed" Judge Butchko was present in 1995 when Attorney Antonacci and another Miami-Dade assistant state attorney testified in favor of Petitioner's disbarment before the Florida Bar, following his acquittal in "Operation Court Broom." [*Id.*].

At various times leading up to his state criminal trial, Petitioner maintains he advised counsel that Judge Butchko would not be fair and impartial and requested her recusal, but Petitioner claims counsel repeatedly told him "not to worry" because "he had a "good relationship" with her and had spent time discussing their pet dogs." [*Id.* at 5-6].

Petitioner further relies upon Judge Butchko's comments at his sentencing hearing to demonstrate her "extrajudicial bias," when she stated that Petitioner had "disappointed the people of this community. . ." and that he "disgraced" himself and his "family by admittedly using narcotics as a sitting Judge." [*Id.* at 6]. According to Petitioner, Judge Butchko further stated that if he had "a conscience" or "felt remorse for past transgressions," he would "never have crossed over the line by committing the crimes" under attack here. [*Id.*].

Petitioner argues, however, that his "drug use" was a result of "coercion and duress" by confidential informant Ray Takiff ("CI Takiff"), who threatened Petitioner's family and his life. [*Id.*]. He further argues he was acquitted of those federal charges, but maintains that Judge Butchko held a past personal, negative opinion of him, which prejudiced Petitioner. [*Id.*]. Thus, Petitioner concludes he has established deficiency and prejudice under *Strickland* arising from counsel's

10

failure to seek her recusal. [*Id.*].

On the other hand, Respondent maintains the rejection of this claim in the Rule 3.850 proceeding should not be disturbed here because "the facts demonstrate that trial counsel made a reasonable tactical decision after listening to Petitioner's concerns and assuaging them by explaining that the trial judge would remain impartial based on his past experiences with the judge." [ECF No. 28 at 22-23].

#### b. *Analysis*

In assessing the merits of Petitioner's claim in the Rule 3.850 proceeding, the trial court applied the proper *Strickland* standard, and denied relief, finding in pertinent part, as follows:

> Whether Judge Butchko would have been obliged to grant a motion to recuse herself had one been filed is a nice question. According to Davis, he and Ms. Antonacci hated each other with a passion boundless; and according to Davis, Judge Butchko was well aware of this mutual loathing. On the theory that 'the friend of my enemy is my enemy,' Mr. Davis alleges that Judge Butchko would have had a vicarious hatred for him because of her close ties to Ms. Antonacci. This, according to Davis, justified his fear that he 'would not receive a fair trial or hearing because of specifically described prejudice or bias of the judge.' Fla. R. Jud. Admin. 2.330(d)(1).

> But the question for me is not whether a motion to disqualify the judge would have been granted if filed. Given the very peculiar law governing judicial disqualification in Florida--allegations of bias or prejudice, even if known to the judge to be utterly false and malicious, must be treated as true for purposes of the motion--it is a relatively easy matter for a sufficiently determined litigant to bring about the recusal of the trial judge. The question before me whether trial counsel's tactical decision not to file such a motion constituted deficient performance.

> For tactical error to constitute ineffective assistance, the tactical decision in question must have been, at the time, so "patently unreasonable that no competent attorney would have chosen it." Carmona v. State, 814 So.2d 481, 482 (Fla. 5th DCA 2002) (quoting Haliburton v. Singletary, 691 So. 2d 466, 471 (Fla. 1997)). Tactical "decisions do not constitute ineffective assistance of counsel if alternative courses have been considered and rejected and counsel's decision was reasonable under the norms of professional conduct." Occhione v. State, 768 So.2d 1037, 1048 (Fla. 2000).… Mr. Davis' post-conviction motion makes abundantly clear that he shared his reservations about Judge Butchko with his trial counsel repeatedly and

11

extensively. . . Undeniably trial counsel was aware of those reservations; responded to Mr. Davis about them . . . and apparently concluded that Davis was as likely to get a fair trial before Judge Butchko as he was before another judge chosen at random. That conclusion was the product of informed consideration of 'alternative courses' and was, in the circumstances, 'reasonable under the norms of professional conduct.' . . .I find no deficient performance.

Even if, however, I were to find deficient performance, the issue of prejudice is foreclosed. The principal basis of Mr. Davis's claim of prejudice is that Judge Butchko imposed a lengthy--a lawful, but lengthy--sentence upon him. . . . That argument the Third District rejected. . . . Recasting the same argument in the present context does not make out a sufficient claim of prejudice as that term is understood in the law of post-conviction practice.. . .

As long as there are judges, there will be some judges who mete out longer sentences and some judges who mete out shorter sentences; some judges who accompany the imposition of sentence with much finger-wagging and some judges who accompany the imposition of sentence with nothing at all. . . . But neither a long sentence nor the accompanying finger-wagging are evidence that trial counsel committed prejudicial error by failing to seek judicial disqualification. No litigant has a right to a judge who imposes the sentence of that litigant's choice, nor to a judge who offers words of consolation while imposing that sentence; and the failure of trial counsel to procure such a judge does not constitute ineffective assistance.

Claim I is respectfully DENIED.

[ECF No. 28-5, Ex. X at 100-05]. The state court's rejection of the claim was subsequently affirmed on appeal. *See Davis v. State,* 271 So. 3d 96 (Fla. 3rd DCA 2019) (*per curiam*), [ECF No. 28-8, Ex. GG at 141-42].

This Court's review of the state court's determination in the Rule 3.850 case is narrow. The Court may determine only if the state court's decision that Petitioner's counsel's strategic decision not to move to disqualify Judge Butchko was (1) "contrary to, or involved an unreasonable application of, clearly established Federal law" or (2) "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

With regard to the first requirement, the court properly applied the *Strickland* two-prong test for ineffective assistance of counsel. The court first analyzed whether counsel's "tactical" decision was "so patently unreasonable that no competent attorney would have chosen it." [ECF No. 28-5, Ex. X at 102]. Strategic choices made after thorough investigation of the law and facts relevant to plausible options are virtually unchallengeable. *See id.* at 690-91. To uphold a lawyer's strategy, a court need not attempt to divine the lawyer's mental processes underlying the strategy, because there are "countless ways to provide effective assistance in any given case." *Id.* at 689. The court noted that counsel properly considered Petitioner's concerns but believed that Petitioner was as likely to get a fair trial before Judge Butchko as he was before another judge chosen at random. [*Id.* at 103]. In fact, according to Petitioner, counsel told him he had a "good relationship with her" and she would be "all right." [ECF 22 at 5]. Trial counsel's decision falls squarely into the realm of considered strategic choices.

The court next properly considered under *Strickland* whether Petitioner had established prejudice finding that the sole fact that Judge Butchko had imposed a 20-year sentence and discussed Petitioner's past offenses and lack of remorse while imposing that sentence did not establish prejudice. Petitioner notes that Judge Butchko had initial offered him and his co-defendant a four-year plea deal which they chose to reject.

Recusal is not warranted simply because Judge Butchko now presided in the same court where Petitioner had served as a judge. *See United States v. Adamson*, 681 F. App'x 824, 828 (11th Cir. 2017). Bias or prejudice must be "personal and extrajudicial" and the judicial acts must demonstrate pervasive bias that unfairly prejudices one party. *Liteky v. United States*, 510 U.S. 540, 555 (1994).

With respect to the second requirement, the state court accepted Petitioner's allegations

13

regarding his conversations with counsel regarding recusal as true. Other than citing to Judge Butchko's comment at sentencing, which does not warrant recusal, Petitioner's comment that her "questionable adverse rulings, all of which negatively impacted Petitioner," without further explanation, does not establish personal and extrajudicial bias sufficient to warrant recusal of the judge. Comments that are critical or disapproving of the parties are insufficient to demonstrate bias. *Litekey*, 510 U.S. at 555-56. The facts presented fail to show actual bias or prejudice.

When an ineffective assistance of counsel claim has been addressed by the state court, this Court must recognize that "[t]aken together, AEDPA and *Strickland* establish a 'doubly deferential standard' of review." *Cullen*, 563 U.S. at 201.

Accordingly, the Court cannot conclude that the state court's decision on claim 1 was in error. Petitioner cannot show deficiency or prejudice under *Strickland* and the rejection of the claim is entitled to deference. Thus, this claim should be denied.

2. Trial and Appellate Counsel's Failure to Challenge Defective Indictment

In **claim 2 and related claim 3,** Petitioner asserts that trial and appellate counsel failed to challenge at trial and raise on appeal that Count 2 of the Information was fatally defective, in that it did not charge a crime. [ECF No. 22 at 7, 12]. He maintains that the Information failed to properly charge an "aggravated white collar crime." [*Id.*]. Therefore, he concludes the Information did not provide adequate notice of the alleged acts, offenses, and the state's theory. [*Id.*].

Count 2 of the Information charged Petitioner with aggravated white collar crime, in violation of Fla. Stat. §§ 775.0844(5) and 777.01, a first degree felony. [ECF No. 28-2, Ex. D at 124]. Specifically, Count 2 charged that:

> PHILLIP S. DAVIS and JOAN MARIE HEADLY aka JOAN M. HEADLEY Beginning on or about January 1, 2002 and continuing through and including December 31, 2002 did unlawfully engage in at least two white collar

14

crimes: Chapter 812, relating to Theft, Robbery, to wit: GRAND THEFT 1st DEGREE and/or GRAND THEFT 2nd DEGREE and/or Chapter 817, relating to Fraudulent Practices, to wit: ORGANIZED SCHEME TO DEFRAUD and/or Chapter 831, relating to Forgery and Counterfeiting, to wit: FORGERY and/or UTTERING A FORGED INSTRUMENT and/or Chapter 896, relating to offenses related to Financial Transactions, to wit: MONEY LAUNDERING, wherein the victim was the State of Florida and/or the victim was a State of Florida political subdivision, to wit: MIAMI-DADE COUNTY, and did thereby obtain or attempt to obtain $50,000 or more, in violation of s. 775.0844(5) and s. 777.011 Florida Statutes, contrary to the form of the Statute in such cases made and provided, and against the peace and dignity of the State of Florida.

[ECF No. 28-2, Ex. D at 126].

He further claims he is "actually innocent" as to Count 2, explaining that "aggravated white collar crime is a separate and distinct offense from any predicate offense," and that "engaging in two white collar crimes without anything more is no crime at all," as determined by the appellate court in the direct appeal of his co-defendant's conviction, *Headley v. State,* 90 So. 3d 912, 915 (Fla. 3rd DCA 2012). [ECF No. 22 at 7-8]. He explains that in *Headley,* the appellate court determined that the essential elements of Fla. Stat. § 775.0844(4) must be charged or the actual subsection cited in order to support an aggravated white collar conviction. [*Id.* at 8].

Respondent argues that Petitioner is not entitled to relief on the substantive claim, even when couched in terms of ineffective assistance of counsel, as the substantive claim involves a matter of state law precluded from federal habeas corpus review, even when couched in terms of violation of due process. [ECF No. 28 at 24-27]. Moreover, Petitioner has not demonstrated that he is actually innocent of the offense. [*Id.*].

Petitioner is not entitled to relief on claims 2 and 3, having failed to demonstrate that the state court's denial of these claims was an unreasonable application of clearly established federal law or an unreasonable determination of the facts in light of the evidence.

15

The Third District Court of Appeal *per curiam* affirmed the rejection of the claim during the Rule 3.850 proceeding, citing to the applicable *Strickland* standard, and finding no deficiency or prejudice relying upon "*Connelly v. State,* 172 So. 3d 893 (Fla. 3rd DCA 2015)(finding no fundamental error where the imperfection of the information did not mislead the defendant as the still had notice of the appropriate statute alleged to be violated); *Mesa v. State,* 632 So. 2d 1094 (Fla. 3rd DCA 1994)(finding no error despite failure to allege essential element of the crime charge 'where the charging document references the specific section of the criminal code which the defendant is charged with violating); [and,] *cf. Knight v. State,* 253 So. 3d 22 (Fla. 3rd DCA 2017)(finding error where the charging instrument failed to allege statute violated and essential elements of the crime)." *See Davis v. Florida,* 2019 WL 943197, *1 (Fla. 3rd DCA 2019), [ECF No. 28-8, Ex. GG at 141]. This finding was proper.

Here, Petitioner argues that Count 2 of the Information is fatally defective because it does not charge a crime. [ECF No. 22 at 7]. He argues that the charged offense should have referred to subsection (4) of Fla. Stat. § 775.0844, an essential element of the offense. [*Id.*]. Florida's White Collar Crime Victim Protection Act (the "White Collar Crime"), Fla. Stat. § 775.0844, was enacted to "enhance the sanctions imposed for nonviolent frauds and swindles, protect the public's property, and assist in prosecuting white collar criminals." *See* Fla. Stat. § 775.0844(2). That statute further defines "white collar crime" to include "the commission of, or a conspiracy to commit," in relevant part, offenses enumerated in specified Chapters, including those set forth in the Information. *See* Fla. Stat. §§ 775.0844(3)(a)(1-11), (b)-(d) (2002). "Aggravated white collar crime" is defined under the statute to "mean engaging in at least two white collar crimes that have the same or similar intents, results, accomplices, victims, or methods of commission, or that are otherwise interrelated by distinguishing characteristics and are not isolated incidents, provided that

16

at least one of such crimes occurred after the effective date of this act." *See* Fla. Stat. § 775.0844(4). Finally, subsection (5) makes it a first degree felony if the defendant obtains $50,000 or more and the victim is, in relevant part, "the State of Florida, any agency, any of the state's political subdivisions, or any agency of the state's political subdivisions." *See* Fla. Stat. § 775.0844(5)(c) (2002).

It is well established that due process requires a charging instrument to provide a defendant with adequate notice of the crime with which he has been charged. *See Russell v. United States,* 369 U.S. 749, 763-64 (1962) (collecting cases). Thus, "the sufficiency of a state indictment is an issue on federal habeas corpus only if the indictment was so deficient that the convicting court was deprived of jurisdiction." *See Williams v. Sec'y, Fla. Dep't of Corr.,* 2017 WL 3255150, at *1–2 (11th Cir. 2017) (quoting *Heath v. Jones,* 863 F.2d 815, 821 (11th Cir. 1989)). A state charging instrument is not fatally defective when it adequately alleges the elements of the offense, names the complaining witness, and sufficiently describes the circumstances of the alleged offense. *See id.* at *1 (quoting *Heath,* 863 F.2d at 821). Petitioner was charged with a violation of Fla. Stat. § 775.0844(5) which increased the felony to a first-degree felony.

Florida courts have rejected similar arguments raised by Petitioner, affirming sufficiency of charging instruments, even where the Information contains technical defects. *See Arnauta v. State,* 125 So. 3d 1028, 1030–31 (Fla. 4th DCA 2013). Like Petitioner, the *Arnauta* defendant argued that the information failed to allege the essential elements of the charged offense, thereby failing to adequately advise the defendant of the nature of the charges. *See id.* at 1030-31. Although the appellate court noted defendant's motions too vague to warrant the relief requested, it nonetheless affirmed Petitioner's conviction finding "the information was not so fundamentally defective that it could not support a judgment of conviction nor so prejudicially vague that it denied

17

defendant the ability to mount a proper defense." *Id.*

Here, the Information named the Petitioner, and sufficiently set forth the charge and circumstances of the alleged offense. *See* Fla. Stat. § 775.0844(5) (2002); *see also Heath,* 830 F.2d at 821. Petitioner was charged with aggravated white collar crime, by committing a violation of Chapter 812, 817, and/or 829. Petitioner's argument that there was insufficient information provided to apprise him of the nature of the charged offense and the predicate violations to support the first-degree felony enhancement fails.

Petitioner contends that the Third District Court of Appeal provided relief to a defendant who similarly argued that his conviction was unlawful because it was predicated on a fatally defective information in *Knight v. State,* 253 So. 3d 22, 23 (Fla. 3rd DCA 2017) (*per curiam*). *Knight* is distinguishable, however, because the appellate court found that the information did not suffer from "a mere technical defect" as to the robbery offense, and instead "wholly fail[ed] to allege the statute violated and the essential elements of the crime." *Id.* at 24 (quoting *Connolly v. State,* 172 So.3d 893, 903–04 (Fla. 3d DCA 2015)).

In addition, to the extent Petitioner argues for the first time in this habeas case in his Reply [ECF No. 29 at 3-4] an independent double jeopardy claim - a claim he had raised in direct appeal of his judgment of conviction, new arguments cannot be properly raised for the first time on Reply. *See* Rules Governing Habeas Corpus Cases Under Section 2254, R. 2(c) (2008) ("The petition must . . . specify all the grounds for relief available to the petitioner[.]"). Likewise, S.D. Fla. L.R. 7.1(c) limits a reply memorandum to only rebuttal of matters in the response without re-argument of matters covered in Petitioner's Amended Petition.

In any event, given the arguments set forth by Respondent on direct appeal, it does not appear that Petitioner's claim warrant relief since the Information did not violate the Double

Jeopardy Clause. *See* [ECF No. 28-3 at 89-99]; *see also Fernandez v. Sec'y, Dept. of Corr.,* 646 F. App'x 899, 900 (11th Cir. 2016) (citing *Blockburger v. United States,* 284 U.S. 299, 304 (1932)). The United States Supreme Court in *Blockburger* established the "same elements" test to determine whether two convictions are the same offense for double jeopardy purposes. *See id.* (citing *Blockburger,* 284 U.S. at 340). "Where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not." *Id.* (citing *Blockburger,* 284 U.S. at 340).

Review of the Information reveals Petitioner was charged and convicted of one count of scheme to defraud $50,000 or more, one count of aggravated white collar crime, two counts of grand theft of more than $20,000 but less than $100,000 and five counts of money laundering. Each count required different proof of facts. *See* [ECF No. 28-2 at Ex. D at 124-55]. Further, the Double Jeopardy Clause "does not prohibit cumulative punishments for a single incidence of criminal behavior when the legislature clearly intends to prescribe cumulative punishments." *See Williams v. Singletary,* 78 F.3d 1510, 1512–1514 (11th Cir. 1996).

To the extent he means to argue here that counsel was ineffective for failing to pursue the issue in terms of actual innocence, Petitioner is not entitled to relief because he cannot demonstrate deficiency or prejudice under *Strickland*. "Actual innocence means factual innocence, not mere legal insufficiency." *McCay v. United States,* 657 F.3d 1190, 1197 (11th Cir. 2011). To prove factual innocence, Petitioner must demonstrate that, "in light of the new evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt." *Smith v. United States,* 637 F. App'x 572, 573 (11th Cir. 2016) (*per curiam*) (citing *Schulp v. Delo,* 513 U.S. 298, 324 (1995)).  Petitioner's argument is one of legal deficiency, not factual, actual innocent. *See*

19

*Justo v. Culliver,* 317 F. App'x 878, 880-81 (11th Cir. 2008) (*per curiam*).

Because the Information was not defective as alleged, the rejection of these claims in the state court proceedings, were not contrary to, or involved an unreasonable application of *Strickland*, or based on an unreasonable determination of the facts. *See* 28 U.S.C. § 2254(d). Accordingly, these claims should be denied.

4. Failure to Retain and Call Forensic Expert

In **claim 4,** Petitioner asserts that trial counsel failed to call an expert forensic accountant to testify at trial and rebut the state's expert and evidence. [ECF No. 22 at 13]. At the Rule 3.850 proceeding, Petitioner presented testimony from Stanley Foodman ("Foodman"), an accountant. [*Id.*]. He claims Foodman's testimony "refuted each of the theories and assumptions the State relief upon" to prosecute and convict Petitioner. [*Id.* at 16]. Had counsel retained Foodman and called this expert as a defense witness to testify at trial, Petitioner argues he would have been acquitted of all charges. [*Id.* at 16]. He argues "no evidence or document" was presented during the Rule 3.850 proceeding to rebut Foodman's testimony. [*Id.*]. Thus, he maintains he has established deficiency and prejudice under *Strickland*. [*Id.*].

According to Petitioner, the central issue at trial involved whether Petitioner's billing method, "termed maximum position billing," was proper and accepted by the funding agencies, or was improper and criminal." [*Id.*]. Petitioner claims it was undisputed that he provided services through his corporation, Miami Dade Resident College ("MDRC") and billed for those services through another corporation, Workforce Management ("Workforce") [*Id.*]. He concedes he received a salary from Workforce under "the grants", and that the bills he submitted "would be for the maximum the position was funded for." [*Id.*].

Respondent argues Petitioner is not entitled to relief because he has not demonstrated

deficient performance and prejudice under *Strickland*. [ECF No. 28 at 27-30]. As discussed below, Petitioner is not entitled to relief on this claim.

### a. Applicable Law Re Failure to Call Witness

For a claim of ineffective assistance of counsel based on the failure to investigate, interview or call a witness to be facially sufficient, the allegations must include: (1) the identity of the prospective witness; (2) that the prospective witness would have been available to testify at trial; (3) the substance of the testimony; and, (4) an explanation as to how the omission of the testimony prejudiced the outcome of the trial. *See Nelson v. State,* 875 So. 2d 579, 583 (Fla. 2004). Failure to demonstrate all four prongs is fatal to the claim.

Under federal law, whether to call a particular witness or cross-examine certain witnesses are generally questions of trial strategy, which seldom, if ever, will be second-guessed. *See United States v. Costa,* 691 F.2d 1358, 1364 (11 Cir. 1982) (*per curiam*); *see also Waters v. Thomas,* 46 F.3d 1506, 1512 (11th Cir. 1995). To show that counsel's conduct was unreasonable, defendant must demonstrate that no competent counsel would have taken the action that his counsel did take. *See Chandler,* 218 F.3d at 1315. The prejudice prong in failing to call a witness is a heavy one because it requires "allegations of what a witness would have testified to" which are often "largely speculative." *Sullivan v. DeLoach,* 459 F.3d 1097, 1109 (11th Cir. 2006) (quoting *United States v. Guerra,* 628 F.2d 410, 413 (5th Cir. 1980)). Speculation about what witnesses could have said is not enough to establish the prejudice-prong of *Strickland. See Conklin v. Schofield,* 366 F.3d 1191, 1204 (11th Cir. 2004).

Even if counsel had conducted further investigation, and assuming that Foodman would have testified as he did at the Rule 3.850 proceeding, Petitioner has not demonstrated that this would have changed the outcome Petitioner's trial. Petitioner's cannot demonstrate *Strickland*

prejudice because he fails to show that the uncalled witness would have been available to testify at trial. *See Reed v. Sec'y, Fla. Dep't of Corr.,* 767 F.3d 1252, 1262 (11th Cir. 2014); *see also Nelson,* 875 So. 2d at 583. Even if Foodman had been retained and available to testify at trial, Petitioner's allegations fail to demonstrate prejudice under *Strickland.*

### b. Summary Evidence at Trial

The trial evidence established that Petitioner set up a "sham corporation" and obtained "reimbursements" for employee salaries from government grant programs, where employees were paid less than the amount invoiced to the grant programs. [ECF No. 28-9, *et seq.*]. Miami-Dade Resident College ("MDRC") was awarded three grants from Miami-Dade Housing Agency ("MD Housing") in the amounts of $50,000, $66,760, and $26,664. [*Id.* at T. 185-86, 216, 324]. Evidence also established MDRC received cost reimbursement grants from the State of Florida, Juvenile Justice Department ("Fla. Juv. Justice"). [*Id.* at T. 394-96]. The evidence demonstrated that Petitioner presented MD Housing with MDRC invoices seeking reimbursement for payroll it claimed to have paid employees. [*Id.* at T. 524-25, 546, 562, 566-67, 619-21, 679-80, 681-82, 701, 714, 723-25]. The invoices listed hours worked and hourly rates greater than MDRC had actually paid to its employees. [*Id.* 525, 545, 576, 589, 61-720, 674, 675, 716].

The grant contracts with MD Housing and Fla. Juv. Justice were also executed by Petitioner and set forth the MDRC employment positions, the percentage of work an employee would perform for each grant, the employee's hourly rate, and the total amount the employee could receive from the grant funds. [*Id.* at T. 300-01, 310-11, 313, 343, 377]. The MD Housing grant paid MDRC $100,577.18 to compensate nineteen employees, but only $36,854.78 was actually paid out to employees. [*Id.* at T. 669, 695, 696].

Specifically, the MD Housing grant administrator and supervisor, **Lisa Skirving**

22

("Skirving"), oversaw the MD Housing grants awarded to MDRC. [ECF No. 28-12 at T. 279-82]. Skirving testified that these were federally funded grants and intended to be used, in relevant part, to implement social service programs designed to decrease criminal activities within different public housing sites and increase programs or services for public housing residents so that they can become self-sufficient and transition out of public housing and assistance. [*Id.* at T. 282-83].

Skirving confirmed that MDRC received monies from three MD Housing grants signed by Petitioner and his co-defendant, Joan Headley ("Headley"). [*Id.* at T. 284, 286-89, 294, 297]. Skirving and other prosecution witnesses testified that the grants were "cost reimbursement grants," meaning MD Housing reimbursed MDRC for funds already paid. [*Id.* at T. 307, 313]. Thus, the three grants required Petitioner to pay out monies for personnel and operating costs and then seek reimbursements from MD Housing based on the approved grant budget. [*Id.* at 303, 307]. Skirving would review reimbursement submissions to ensure they concerned public housing residents and that the amount requested matched the attached invoices. [*Id.* at T. 313-18]. Thereafter, she would issue payment reimbursement to MDRC on MD Housing's behalf. [*Id.* at T. 332-33]. Most of the grant monies awarded was for payroll, while a small percentage was to reimburse MDRC for operating expenses. [*Id.* at T. 299-300, 310].

She further confirmed the contract between MD Housing and MDRC authorized the shifting of funds only with her approval, as set forth in the submitted budget summary, attached to the Requests for Proposals. [*Id.* at T. 298]. She denied approving any budget modifications or shifting of funds from personnel to operating services, and states none were ever requested by Petitioner or his co-defendant. [*Id.* at T. 299-300].

At one point, Skirving recalled meeting with Petitioner because three of MDRC's employees assigned to the Drug Elimination Grant program had not been working for MDRC but

had been paid. [ECF No. 28-13 at T. 356]. Petitioner claimed he was unaware of the discrepancies because Workforce Management, Inc. ("Workforce") managed all of his payroll issues. [*Id.* at T. 357]. Skirving advised Petitioner MDRC was in non-compliance with the terms of the MD Housing contract entered by MD Housing with MDRC and not with Workforce. [*Id.* at 358]. She further advised Petitioner investigations revealed payments were made that were "advance payments" instead of "reimbursements." [*Id.* at 359-61]. Skirving also discovered discrepancies in the amount MDRC invoiced MD Housing and the amount paid to MDRC employees, including the amounts of hours and rates of pay per hour. [*Id.*]. She communicated her findings to her supervisor, Sharon Tyler, after which they ceased paying MDRC because of its non-compliance with the terms of the grants. [*Id.* at T. 361].

Evidence also established that MDRC had been awarded a cost reimbursement grant from the Fla. Juv. Justice. [ECF No. 28-13 at T. 398, 661]. The grants were intended to fund two positions up to a maximum of $50,000 for contractual staff services and consultants. [*Id.* at T. 399, 411, 712, 713]. Specifically, **Marie Boswell ("Boswell")** testified that after the grant funds are approved for funding by the State of Florida, she manages the grants to ensure agencies that are approved for the grant monies utilize the funds in accordance with the terms proposed on the grant. [ECF No. 28-13 at T. 394-96].

Boswell testified that MDRC received cost reimbursement grant monies. [*Id.* at T. 397-400]. Under the terms of the grant, Petitioner was required to pay for services and then seek reimbursement, by providing copies of invoices and proof of payment. [*Id.*]. Boswell identified Petitioner and his co-defendant as the individuals who submitted the reimbursement documentation to the Fla. Juv. Justice. [*Id.* at T. 414-18].

**Freddie Howard** ("Howard"), a convicted felon, testified he has known Petitioner since

24

1999, and was Petitioner's neighbor. [ECF No. 28-13 at T. 446-48]. Howard was the President of Workforce which was incorporated and funded by Petitioner as a payroll company. [*Id.* at T.448-49]. Although the initial deposit to open the Workforce bank account was made by Howard, the funds were provided by Petitioner. [*Id.* at T. 474]. Howard also claimed it was Petitioner's idea to name him President of Workforce, and states he was paid $600 a month for his services. [*Id.* at 450, 466]. Howard testified that his relationship with Workforce ended in March 2001, when he quit after Petitioner started losing grants and stopped paying him. [*Id.* at 451-52].

Howard denied meeting, hiring, mentoring, or evaluating prospective or current employees of MDRC. [*Id.* at 452-54]. Although his contract with Workforce required that Howard be compensated for supplying contracted staff for MDRC, he never supplied any staffing. [*Id.* at T. 455, 472]. He claims Workforce was not in the employee staffing business as it only had accounting and bookkeeping licenses. [*Id.* at T. 480].

Howard was solely responsible for doing the MDRC payroll and prepared the payroll based on information and time sheets Petitioner and/or Petitioner's co-defendant provided to him which contained the numbers of hours and rate of pay for each employee. [*Id.* at T. 458, 463, 468]. Payroll checks were then delivered to Petitioner for distribution. [*Id.* at T. 469]. When a new employee was hired by MDRC, Petitioner would provide Workforce with an employment contract which Howard would sign, but Howard denies ever meeting or interviewing any new employees. [*Id.* at T. 459-60].

Howard testified that Petitioner had told him that for the MDRC grants to be approved, he had to have an independent company do payroll for MDRC employees. [*Id.* at T. 461]. Howard admitted there were differences between Petitioner's invoices and the actual amounts owed to employees and/or the amount of hourly rate billed. [*Id.* at T. 465]. He claimed the monies received

as a result of this overbilling would remain in the payroll account so that Petitioner could cover costs associated with field trips, graduation parties, etc. [*Id.* at T. 465-66].

**MDRC former employees** testified that during their employment with MDRC, they were required to "punch" a time clock when arriving and leaving work. [ECF Nos. 28-14 at T. 537-555, T. 556-67, T. 572-79, T. 580-84, T. 585-96, T. 597-608, T. 609-24]. As required, some employees also keep a daily log if they needed to visit a specific client. [*Id.*]. All employees were paid as independent contractors and were only paid for the number of actual hours worked at the contracted rate of pay. [*Id.*]. Employees further indicated that, in addition to their handwritten time sheets, and punch clock receipts, they were required to sign blank calendars called "timesheets" which did not reflect the exact number of hours, only their respective names and signatures. [*Id.*]. All the employees confirmed being interviewed by either or both Petitioner and his co-defendant but denied meeting Howard at any time. [*Id.*]. The employees also denied being aware of the fact that MDRC was overbilling MD Housing or Fla. Juv. Justice more than the number of hours they actually worked, and more than the agreed upon rate of pay. [*Id.*]. To their knowledge, they were paid by the grants based on a contract between MDRC and Workforce. [*Id.* at T. 520, 543, 575].

**Anthony Ferris** ("Ferris"), a supervisory special agent ("Agent") with the Miami-Dade Inspector General's Office, testified he works investigating allegations of waste, fraud, and abuse within Miami-Dade County ("County") or anything funded with County money. [ECF No. 28-14 at T. 627-28]. Agent Ferris then summarized his experience and familiarity with investigating money laundering and financial crimes, having worked for the Internal Revenue Service ("IRS") and received training in financial analysis. [ECF No. 28-14 at T. 625-26].

Agent Ferris next testified he was the lead agent investigating allegations that grant monies from MD Housing were misappropriated by MDRC, Petitioner, and his co-defendant. [*Id.* at T.

26

629-29]. Agent Ferris testified he reviewed the following MD Housing grants awarded to MDRC: (1) Life Skills Neighborhood Enhancement Training for Fiscal Year 1999; (2) Life Skills and Neighborhood Enhancement for Fiscal Year 2000; and, (3) Vocational Training and Pre-Apprenticeship for Fiscal Year 2000. [*Id.* at T. 629-31]. Agent Ferris confirmed these grants were cost reimbursement grants that allowed MDRC to be reimbursed for expenses paid in accordance with the terms of the approved grant. [*Id.* at T. 632]. Agent Ferris confirmed reviewing the grants, invoices submitted to MD Housing along with all attachments, together with records from Workforce, bank account statements and cancelled checks from Union Planters Bank, formerly Regions Bank. [*Id.* at T. 632-652]. During that investigation, he also reviewed the billing and bank information relating to the Fla. Juv. Justice grant. [*Id.* at T. 656].

Agent Ferris explained in detail that for every check issued by MD Housing, he went through each banking statement obtained from Workforce and MDRC to determine where the funds were deposited, and was able to confirm the MD Housing check were deposited into the MDRC bank account, no. 6296600429. [*Id.* at T. 657-58, 661].

He next explained that a review of Workforce bank account, no. 629660461, helped him trace the flow of monies from MD Housing to MDRC to Workforce and then to the MDRC employees. [*Id.* at T. 664]. MDRC would issue checks to Workforce in the exact amount of the payroll invoices submitted to MD Housing and paid by MD Housing to MDRC. [*Id.* at T. 667-68, 740-43]. Review of the records confirmed that Workforce checks were written to employees of MDRC compensating them for less than what MD Housing paid MDRC on their behalf. [*Id.* at T. 669, 672-77]. Agent Ferris testified in detail how he reviewed and compared payments and billings for about eighteen employees and prepared a chart itemizing the overbilling by MDRC to MD Housing. [*Id.* at T. 677-96, 700-726]. Agent Ferris concluded that MDRC billed MD Housing for

payroll services in the amount of $100,557.18, of which Petitioner actually paid his employees only $36,854.78, for a total overbilling of $63,702.40. [*Id.*]. He also detailed the overbilling by MDRC to the Fla. Juv. Justice and monies received from this billing. [*Id.* at T. 696-746]. Agent Ferris also testified no evidence came out during his investigation that the overbilling monies went into Howard's pocket. [*Id.* at T. 803-04]. Agent Ferris acknowledged that not all funds received by MDRC came from grant funds because MDRC also received monies from pre-trial diversion programs and other grants not at issue here. [*Id.* at T. 811-14]. Agent Ferris concluded that nothing in the MD Housing contracts allowed Petitioner to bill for and obtain the difference between the maximum allowable charge and what was actually billed for the service provided. [*Id.* at T. 813-14]. Notably, Agent Ferris also discovered that he was able to find checks issued to all employees for which reimbursement was sought as part of a billing invoice, with the exception for an employee, Kamia Curry. [*Id.* at T. 815]. Agent Ferris testified that MDRC sought reimbursement for payment to her, but he could not find any checks issued to Curry either from Workforce or MDRC. [*Id.* at T. 815-16].

**Petitioner** also testified. He stated that he was MDRC's executive director. [ECF No. 28-16 at T. 901-02]. As such, Petitioner decided which grants to apply for, formulated the grant proposals, and submitted them to MD Housing for approval. [*Id* at T. 1042].

In relevant part, Petitioner testified that not all of the MDRC grants were cost reimbursement grants, because some of them were for services performed. [*Id.* at T. 909-910]. A services performed grant required proof the service is performed and that the individual was paid for that service. [*Id.* at T. 910]. According to Petitioner, MDRC employees were independent contractors. He exclusively used staffing companies to process MDRC employee payroll. [*Id.* at T. 910-12]. Petitioner acknowledged that Workforce is identified in each of the initial contracts

and grants that are the subject of his prosecution. [*Id.* at T. 912-13].

Petitioner denied overbilling MD Housing or Fla. Juv. Justice for employee pay, explaining that he "position" billed, a system of billing he developed based on the position and the maximum hourly rate allowed for that position, not the actual hours worked or rate of pay. [*Id.*]. Petitioner denied having any employee sign the time sheet in blank. [*Id.* at T. 1094].

He claimed that one employee might sign and witness that they "benefitted, in some part, for their grant for their pay. . . [and] the rest of the money goes to pay others that support that position." [*Id.* at T. 918]. Because no forms were provided to him after he was awarded the grants, Petitioner admits he "created" this "billing process." [*Id.*]. Because he was not "capitalized" at the time MDRC was incorporated, he developed this billing method which allowed him to pay individuals using the "excess" to pay others and to pay for supplies and services. [*Id.* at T. 925].

Petitioner acknowledged that his billing method was questioned by employees of MD Housing, and that question arose regarding Workforce. [*Id.* at T. 925]. At the time he was told they had the right to stop funding, but Petitioner claims funding was not stopped because of the way he was billing MD Housing. [*Id.* at T. 927-30]. Petitioner also testified that Curry was never paid because she left the United States unexpectedly, returning to the Bahamas after her mother passed, and never sought payment for work performed. [*Id.* at T. 930-32]. He claimed Curry's payroll check was still at MDRC. [*Id.*].

He denied intending to defraud MD Housing or Fla. Juv. Justice by creating a billing process that permitted billing more than what was actually paid for services rendered. [*Id.* at T. 950]. He denied creating Workforce as a "sham corporation" and insists it was a legal corporation in charge of MDRC payroll. [*Id.* at T. 999].

Petitioner also denied commingling funds provided by the MD Housing grants with any

29

other funding sources. [*Id.* at T. 1130]. He concedes the MD Housing and MDRC contract approving the grant funds specifically provides that Petitioner cannot commingle funds provided under the agreement with any other funding sources. [*Id.*]. Petitioner explained this meant he needed to keep a separate accounting on his computer of the funds, but that the monies could be deposited into a single MDRC bank account. [*Id.* at T. 1131].

### c. Summary Rule 3.850 Evidence

At the December 11, 2015 evidentiary hearing, Petitioner's former trial counsel, Robert Barrar, Jr. testified extensively regarding his numerous discussions with Petitioner regarding defense strategy. [ECF No. 28-22 at 1-76]. A

Attorney Barrar recalled that the "heart" of the state's case was evidence that MDRC employees were billed out at a higher rate of pay and/or for more hours than he was actually paid. [*Id.* at T. 12]. Barrar explained that he did not call numerous defense witnesses, as suggested by Petitioner in his post-conviction motion, because they either did not have anything helpful to testify about, could not be located, or may have provided incriminating testimony. [*Id. at* T. 31-76]. Further, Barrar explained that Petitioner was not a "neophyte," having been previously been a defendant, a prosecutor, a defense attorney, and a sitting judge. [*Id.* at T. 41]. During every step of the proceeding, Petitioner was aware of Barrar's trial preparation, and the defense strategy involved. [*Id.* at T. 41]. During cross-examination, Barrar explained that because Petitioner contributed to his defense at every stage, he asked Petitioner to put in writing the witnesses he wanted called. [*Id.* at T. 62-63]. Notes from Petitioner to Barrar confirmed he had represented himself to be the chairman of the MDRC board. [*Id.* at T. 65]. Petitioner had represented that he had nothing to do with Workforce. [*Id.* at T. 65-66]. Barrar advised Petitioner that a proposed accountant, Lawrence Brown, could not testify as to what had occurred between MDRC and

Workforce. [*Id.* at T. 68].

At the continued Rule 3.850 evidentiary hearing on August 24, 2016, Petitioner called Foodman as an expert forensic accountant. [ECF No. 28-23 at T. 1-81]. Foodman testified he had been provided with "replicas" of tables related to payments made to certain employees of MDRC and/or Workforce, introduced at trial as state's exhibits 30 and 31, together with MDRC and Workforce cancelled checks and bank records. [*Id.* at T. 6-7]. Foodman conceded he had not been provided all trial documents or discovery for review, only those provided by Petitioner's post-conviction counsel. [*Id.* at 25]. He concluded he could only reach a definitive conclusion regarding the source of funds received and/or paid to MDRC if he were provided with documents showing receipt of all funds from MD Housing, and other sources, including other grants. [*Id.*].

Foodman further testified he never reviewed or saw the general ledger books or records for MDRC or Workforce so he could not opine whether the evidence, in fact, established that the methods used would establish the money laundering offenses. [*Id.* at T. 29]. Foodman emphasized that the conclusions contained in his affidavit provided to post-conviction counsel was based on review of those limited documents provided by collateral counsel. [*Id.* at T. 37, 42-43]. He further confirmed that prior to his testimony that day, the defense had not provided for his review copies of the original grant contracts between MDRC and MD Housing and between MDRC and Fla. Juv. Justice. [*Id.* at T. 37-38]. Foodman testified "it would have been nice" to have had bank records for transfers to "VDU accounts" from Workforce and to verify if any of the transfers were to Petitioner's personal account. [*Id.* at T. 44]. Foodman testified he was also not provided with any non-check transfers from Workforce to MDRC. [*Id.* at T. 45].

Foodman next testified that the grants between MDRC and MD Housing and Fla. Juv. Justice were "cost reimbursement contracts," that would reimburse MDRC for services performed

and paid by MDRC and then billed to MD Housing and Fla. Juv. Justice. [*Id.* at T. 7-8]. He claims the agreement between MDRC and Workforce was titled as a "subcontract," and set forth the payment procedures between MDRC and Workforce, where Workforce would do payroll for MDRC employees. [*Id.* at T. 9]. Foodman agreed that the MDRC and Workforce sub-contract did not set up as a "cost reimbursement contract." [*Id.* at T. 11]. If Foodman had the sub-contract attached to the MDRC and MD Housing or Fla. Juv. Justice contract grants, it would have raised questions about the difference in the sub-contract and general contract, and whether the sub-contract could be seen as "overriding" the general grant contract. [*Id.* at T. 12-13].

He reviewed the sub-contract and claims it provided a procedure whereby Workforce would submit a time-sheet or schedule that an employee worked at MDRC which included the maximum number of hours bills for a specific position, together with the maximum allowable rate of pay for that position. [*Id.* at T. 14-15]. Foodman confirmed that MDRC was paid by MD Housing based on the Workforce time-sheets or schedule submitted to MDRC, and further conceded that the difference between the actual hours and pay rate for a particular employees and the amount actually billed were never paid to the employees even though the government grant agency had for it. [*Id.* at T. 16]. Foodman confirmed, however, that "maximum position billing," as was done by MDRC is not a term he has ever seen under general accounting principles, but was a term that Petitioner used. [*Id.* at T. 61-62].

Foodman believed that Agent Ferris' chart concluding that there was an overbilling of $63,702.47 is "misleading" and "inaccurate" because there was no overbilling if the billing was based on "maximum position billing," as opposed to "cost reimbursement billing." [*Id.* at 20]. He claims Agent Ferris did not indicate on his chart, introduced at trial, that twelve of the eighteen employees listed thereon were paid under the "maximum position billing" method, and the chart

did not reflect that the other $30,168.38 were paid by MDRC to other employees. [*Id.* at T.22-24]. Foodman concluded that, from what he reviewed, he did not find anything was "amiss" with the funds MDRC received, and could find no evidence of "fraud" because the MDRC billing was done in accordance with the contract between MDRC and Workforce and then submitted to MD Housing. [*Id.* at 33-34].

Foodman claimed that if the maximum position billing was permitted under the general grant contracts between MDRC and MD Housing and Fla. Juv. Justice, then it would have been proper for MDRC to bill individual employees at a higher rate of pay than that which they were actually paid, but conceded this method would not be proper under a "cost reimbursement" method. [*Id.* at T. 71-72].

### d. Analysis

Initially, when the claim was raised in the Rule 3.850 proceeding, it was summarily rejected by the trial court on the finding that the claim was procedurally barred and failed on the merits because Petitioner could not demonstrate *Strickland* prejudice. [ECF No. 28-7, Ex. BB at 13]. After rehearing on the summary denial was granted, a second evidentiary hearing was held during which Foodman testified as previously summarized. Thereafter, a final, detailed order was entered denying the claim on the merits. [ECF No. 28-7, at 14-18].

Specifically, the court found Foodman testified he had not been provided with a complete copy of the business records associated with Petitioner's companies, and had he been provided with all of the records he "would be in a position to testify that the accounting methods and procedures used by Mr. Davis and his business entities were consistent with generally accepted accounting practices, and that there was no indication that those methods and procedures were used to perpetuate a fraud on Miami-Dade County;" but since he was not provided with complete

33

records, he "really can't be sure if that's true or not." [*Id.* at 14].

The court provided extensive excerpts from Foodman's testimony corroborating this finding, finding that the "examples could be multiplied many, many times over," but noted that "doing so would destroy whatever shreds and patches of readability remain[ed]" to the court's order. [*Id.* at 15-17]. The court found even if Foodman or another expert had been provided with a complete documentary record, including "books and records, the tax returns, and the bank statements. . . as well as the transcript of the trial, . . .and . . . other things. . . that he might have had relevant and exculpatory testimony to offer. It is also entirely possible that he might not have" been given these documents for review. [*Id.* at 17-18].

Thus, the court concluded Foodman was "in no position to say with reasonable professional certainty one way or the other" that the accounting methods and procedures used by Mr. Davis and his business entities were consistent with generally accepted accounting practices. [*Id.* at 18]. Therefore, the court concluded correctly that Petitioner's ineffective claim arising from the "failure to adduce the testimony of a forensic accountant at trial" is not entitled to relief because the claim is "wildly and irremediably speculative. . ." [*Id.*]. and cannot support relief. . . "The trial court's rejection of the claim was subsequently *per curiam* affirmed on appeal citing *Strickland*. *Davis v. State,* 2019 WL 943197 at *1, [ECF No. 28-8, Ex. GG at 142].

Given the more than sufficient evidence adduced at trial, Petitioner has not demonstrated that Foodman's testimony would have altered the outcome of the proceedings. *See Fugate v. Head,* 261 F.3d 1206, 1239, n. 54 (11th Cir. 2001). This is fatal to Petitioner's claim. Petitioner cannot maintain an ineffective assistance of counsel claim "simply by pointing to additional evidence that could have been presented." *Van Poyck v. Fla. Dep't of Corr.,* 290 F.3d 1318, 1324 (11th Cir. 2002). In fact, as is evident by the trial court's rejection of the claim, Foodman's testimony was

predicated on an incomplete, limited review of the record so that the accountant's testimony is, as noted by the state trial court, as good as the information upon which the opinion is based. Thus, the court's finding that Petitioner cannot establish *Strickland* prejudice is more than amply supported by the record. Thus, the rejection of the claim in the state forum was not contrary to nor an unreasonable application of *Strickland and* should not be disturbed here. *See Williams, supra.*

5. Failure to Request a Good Faith Defense Instruction

In **claim 5,** Petitioner alleges trial counsel failed to request a good faith defense instruction. [ECF No. 22 at 17]. Petitioner maintains that trial testimony established that he was permitted to use maximum position billing, that he made everyone aware of his billing method, and that even after an issue arose as to his billing method, MD Housing and Fla. Juv. Justice continued to "fund" MDRC under the approved grants. [*Id*]. Thus, because his defense was a "lack of intent" and the grant agencies knew about his billing method and continued to pay on the grants, the instruction was warranted. [*Id.*]. He concludes that if counsel had requested the instruction, he would have been acquitted of all charges. [*Id.*].

This claim was summarily denied by the trial court in the Rule 3.850 proceeding, finding no ineffectiveness because the court could not ascertain where such an instruction can be found in the "Florida Standard Jury Instructions" nor what the jury instruction "consists of." [ECF No. 28-5, Ex. X at 114]. Further, the court noted that Petitioner's motion failed to identify any  reported opinion in which "the 'good faith' defense jury instruction' was given, nor reported opinion explaining what . . . instruction is . . ." nor identifying the crimes to which such an instruction might apply. [*Id.*]. The rejection of the claim was subsequently affirmed by the appellate court in a written decision, citing *Strickland. See Davis v. State,* 129 So. 3d 1067 (Fla. 3rd DCA 2013), [ECF No. 28-8, Ex. GG at 141-42].

Petitioner is not entitled to relief on this claim. As correctly determined by the state courts, Petitioner has not demonstrated *Strickland* prejudice arising because he has not shown that q special jury instruction would have been given by the court, much less that it would have had a reasonable probability of changing the outcome of the case.

Under Florida law, a trial judge's finding that a defendant is not entitled to an instruction on a good faith theory of defense may be premised on a finding of either complete and total lack of evidence to support the defense or a finding that the evidence supporting the defense was demonstrably false or inconsistent with honest conduct. *See Cliff Berry, Inc. v. State,* 116 So. 3d 394, 408 (Fla. 3d DCA 2012) (citing *Durie v. State,* 751 So. 2d 685, 690 (Fla. 5th DCA 2000) (finding defense not entitled to good faith defense instruction because defense was demonstrably false or inconsistent with honest conduct)); *see also Stephens v. State,* 787 So. 2d 747, 756 (Fla. 2001) (stating that in order to be entitled to a special jury instruction, the defendant must prove that the special instruction was supported by the evidence).

Review of the record confirms that the only evidence adduced at trial to support the good faith defense was Petitioner's own self-serving testimony. [ECF No. 28-17]. Petitioner's testimony that his maximum position billing was "condoned" or otherwise allowed by MD Housing and Fla. Juv. Justice is inconsistent by the prosecution witnesses who clearly testified that Petitioner's grant contracts were premises on "cost reimbursement" which required advance pre-payment by Petitioner and then submission with supporting documentation by Petitioner to MD Housing and Fla. Juv. Justice for reimbursement under the terms and conditions of the grant contact executed with MDRC. By the terms explicitly provided by the MD Housing and Fla. Juv. Justice grant contracts with MDRC, there was no evidence demonstrating that Petitioner's billing method was authorized or condoned by the approved grants. Petitioner's argument that their continued

payments on the grant or reinstatement of payments on the grant suggests a modification to the terms of the initial contract is refuted by the record which established that any modifications or alterations to the general grant contracts between MDRC and MH Housing and Fla. Juv. Justice had to be in writing.

Given the record before the state courts and in this federal habeas proceeding, Petitioner cannot demonstrate that the trial court judge would likely have granted a good faith jury instruction, even had his trial counsel requested it. Therefore, Petitioner's assertion that the state court had no reasonable basis to deny his ineffective assistance of counsel claim under *Strickland* fails. The cases relied upon by Petitioner involved theft charges and none extend the instruction to the context of Petitioner's charged offenses. At least one Florida court has refused to extend the common-law good faith defense beyond the context of Florida theft cases. *See Thomas v. State,* 584 So. 2d 1022 (Fla. 1st DCA 1991). In *Thomas,* the court limited the defense to theft cases where defendant takes personal property as opposed to a "fungible good like money" or to cases where "there was no taking of any property." *See Thomas,* 584 So. 2d at 1026-27.

Because there is no showing that such an instruction would have been granted by the court had counsel made the request, Petitioner cannot satisfy *Strickland's* prejudice prong. Thus, there is no need to address deficiency. *See Strickland*, 466 U.S. at 687. Petitioner's counsel was not ineffective for failing to request an instruction on the good faith theory of defense.

Consequently, Petitioner has not demonstrated that the state court's rejection of this ineffective assistance claim was "so lacking in justification that there was an error . . . beyond any possibility for fairminded disagreement." *Burt,* 571 U.S. at 13 (quoting *Harrington,* 562 U.S. at 103). The Court, therefore, concludes that the state court's denial of relief was not unreasonable or lacking in justification. Accordingly, Petitioner is not entitled to relief on this claim.

**B. Trial Court Error Claim**

In **claim 6,** Petitioner asserts that the trial court erred in denying his motion to disqualify Judge Milton Hirsch from presiding over the Rule 3.850 Motion on the basis that the judge was biased and prejudiced. [ECF No. 22 at 18]. Petitioner claims when he first saw Judge Hirsch on December 11, 2015, he recalled they had worked together at the State Attorney's Office in Miami-Dade County. [*Id.*]. At that hearing, Petitioner felt Judge Hirsch was "dismissive and cold" towards him and had "always looked down on him and his education as an attorney." [*Id.*]. Petitioner also felt he would not receive a fair and impartial hearing on his Rule 3.850 Motion because Judge Hirsch was unwilling to entertain a continuance despite Petitioner having recently hired collateral counsel, who needed additional time to prepare for the hearing. [*Id.*]. Moreover, he claims in 1992 Judge Hirsch told the "national media" covering Petitioner's federal trial, in relevant part, that "judges are held in high regard by the community . . . So it's a hell of a shame when this kind of thing happens." [*Id.*]. Based on all the foregoing, Petitioner claims he demonstrated a facially sufficient ground for disqualification of Judge Hirsch. [*Id.*].

Respondent argues correctly that claims arising from alleged bias of a post-conviction judge are not cognizable on federal habeas review. [ECF No. 28 at 34]. Thus, Petitioner is not entitled to habeas corpus relief on this claim.

1. Claim Not Cognizable

First, the claim of trial court error regarding the post-conviction court's denial of Petitioner's motion to recuse is not cognizable on federal habeas corpus review. The Eleventh Circuit has repeatedly held that federal habeas corpus review is not available for issues arising from violations of state law. *See Trice v. Sec'y, Fla. Dep't of Corr.,* 766 F. App'x 840, 848 (11th Cir. 2019) (*per curiam*) (citing *Jamerson v. Sec'y for Dep't of Corr.,* 410 F.3d 682, 688 (11th Cir.

2005)). Federal courts are bound by state court determinations on state law questions as they are "the ultimate expositors of state law." *Id.* (citing *Estelle v. McGuire,* 502 U.S. 62, 67-68 (1991); *Mullaney v. Wilbur,* 421 U.S. 684, 691, (1975)). This state law issue is not cognizable here even when "couched in terms of equal protection and due process." *Brannan v. Booth,* 861 F.2d 1507, 1508 (11th Cir. 1988) (*per curiam*) (citation omitted). In any event, Petitioner is also not entitled to relief on this claim on the merits either.

2. <u>Merits Discussion</u>

### a. *Applicable Law*

As set forth in relation to claim 1 above, "the Due Process Clause clearly requires that a judge presiding over a trial have no "actual bias against the defendant or interest in the outcome of his particular case." *Norris,* 820 F.3d at 1266 (quoting *Bracy,* 520 U.S. at 904–05 (citations omitted)). Under Florida and federal law, a judge is required to disqualify himself in any proceeding in which his impartiality might reasonably be questioned or where he actually has a personal bias or prejudice against a party. *See* 28 U.S.C. § 455(a) and (b)(1); *see also* Fla. R. Jud. Admin. 2.330, *Corey*, 954 So. 2d at 70; *Norris,* 820 F.3d at 1266.

### b. *Analysis*

At a December 11, 2015 hearing, Petitioner's court-appointed counsel at the time, Attorney Delgazo ("Attorney Delgazo"), indicated he could not continue to represent Petitioner since Petitioner had fired him twice. [ECF No. 28-21 at T. 3]. Attorney Delgazo further advised the court that even if he were required to remain on the case, he would not be ready to proceed on the Rule 3.850 evidentiary hearing scheduled the following week. [*Id.*]. Before the state was heard on the matter, the court noted that the hearing would proceed, and if Delgazo's motion were granted, Petitioner would proceed *pro se*, as there is no constitutional or statutory entitlement to legal

39

representation at a post-conviction hearing. [*Id.*]. After hearing from the state, Attorney Delgazo advised the court that Petitioner "had made clear that he has hired an attorney" and because he had been fired twice, it "hindered" counsel's "ability to attempt to represent him," and therefore moved to withdraw from further representation. [*Id.* at T. 4-5].

The court then granted Delgazo's motion. [*Id.* at T. 5]. After being granted permission to address the court, Petitioner stated he had hired new counsel. [*Id.*]. The court indicated he would be proceeding with the hearing on Tuesday, and cautioned Petitioner that "if anyone in good standing with the Florida bar is coming forward to represent you [Petitioner] it will be heard if not we will proceed in the absence of your representation. But we will have a hearing." [*Id*]

In response, Petitioner then indicated that he had been "in discussion with" Daniel Tibbitt, Esquire ("Attorney Tibbitt"), who was present in court. [*Id.*]. Attorney Tibbitt acknowledged his presence but advised the court that he had "just entered an appearance" and cannot be ready to proceed on Tuesday. [*Id.*]. The court responded that not only are "death and taxes" a certainty, but that the hearing would "take place on Tuesday," and he "would be delighted" to have counsel there. [*Id.* at 6]. The court advised Tibbitt that there would be no continuance. [*Id.*]. In response, Petitioner again asked to be heard, to which the court responded, "You were, thank you.," after which the proceedings concluded. [*Id.*].

At the hearing before Judge Hirsch, Attorney Tibbitt appeared on Petitioner's behalf, having filed a notice of appearance and a motion to disqualify Judge Hirsch in open court that day. [ECF No. 28-22, at T. 3]. The trial court denied the motion as facially insufficient. [*Id.*].

Tibbitt argued, however, that it wanted to "make the record" that, if accepted as true, the motion alleged Judge Hirsch and Petitioner had an "acrimonious relationship," when they used to work together, and that Judge Hirsch demonstrated bias when he would not allow Petitioner to

speak at the time Petitioner was proceeding *pro se*. [*Id.* at T. 3-4]. The court noted the defense's objection to the court's ruling, tacitly re-affirming its denial. [*Id.* at T. 4].

Tibbitt also explained that Petitioner had filed an amendment to his Rule 3.850 hearing which would require a hearing regarding the ineffective claim for failing to secure a forensic accountant. [*Id.* at T. 4-5]. The court indicated it would review the amendment and, if that were the case, then the hearing could be continued as to that claim, but that it was prepared to proceed on the claims scheduled for hearing that day. [*Id.* 5-6].

Attorney Tibbitt stated that he was "qualified to represent" Petitioner "but like any competent attorney" he needed "time to prepare." [*Id.*]. Further, counsel indicated he was not prepared to call any witnesses. [*Id.*].

Again, the trial court denied the requested continuance. [*Id.*]. Thereafter, Petitioner's former trial counsel, Robert Barrar testified and was extensively examined by Tibbitt. [*Id.* at T. 8]. At the conclusion of Attorney Barrar's testimony, the prosecution reminded the court that the burden of proof in the post-conviction proceeding rested with Petitioner, to which Tibbitt reminded the court he had no witnesses available that day. [*Id.* at T. 76].

The court acknowledged Tibbitt had requested time to either call witnesses or review the trial transcripts, and in response to Tibbitt's request for a ninety-day continuance, granted Petitioner a sixty-day continuance before concluding the evidentiary hearing. [*Id.* at T. 75-76]. Given counsel's representation that Petitioner anticipated calling other witnesses, the judge ordered Petitioner to file a witness list prior to the scheduled hearing. [*Id.* at T. 78].

Further, the record confirms that the continued hearing did not occur until over eight months later on August 24, 2016. [ECF No. 28-23]. The evidentiary hearing continued on November 14, 2016, where the parties provided closing argument, and the court deferred ruling

41

until copies of the transcripts could be provided by the court order. [ECF No. 28-24 at 23-24].

On this record, Petitioner has not demonstrated actual bias arising from Judge Hirsch's initial denial of his motion to continue. Petitioner was given over eight months to retain an expert and prepare for his continued hearing on his motion. Moreover, even if four days from the time Tibbitt was appointed was insufficient to prepare for the initial Rule 3.850 hearing, certainly the eight-month continuance until the August 2016 hearing provided Petitioner with more than sufficient time to interview and secure witnesses, review trial transcripts, and more than adequately prepare for the evidentiary hearing. Thus, Petitioner has not demonstrated that the court's rulings were prejudicial or demonstrated actual bias. *See Cooper Tire & Rubber Co. v. Rodriguez,* 997 So. 2d 1124, 1126 (Fla. 3rd DCA 2008) (noting there is a difference between "holding the parties feet to the fire" and creating a well-grounded fear warranting disqualification).

Even if Petitioner feared Judge Hirsch would be biased because of their prior "acrimonious" relationship as the judge's attitude was "dismissive" and "cold," this subjective fear, without more, is insufficient to warrant judicial disqualification. *See 5-H Corp. v. Pavodano*, 708 So. 2d 244, 248 (Fla. 1997) ("a Florida judge's mere reporting of perceived attorney unprofessionalism to The Florida Bar, in and of itself, is legally insufficient to support judicial disqualification," noting defendant's allegations are to "speculative, attenuated, and too fanciful" to warrant relief); *see also Correll v. State,* 698 So. 2d 522 (Fla. 1997).

### c. Conclusion

Thus, the trial court's denial of the recusal motion was not erroneous. *See Fischer v. Knuck,* 497 So. 2d 240 (Fla. 1986). The record does not confirm that the court was biased against the Petitioner or deprived him of a fair hearing. Therefore, the Florida court's rejection of this claim is not contrary to or an unreasonable application of clearly established federal law and is not based

on an unreasonable determination of fact. Relief should be denied.

## VI. Cautionary Instruction Re *Clisby*[4] Rule

The Court is mindful of the *Clisby* rule that requires district courts to address and resolve all claims raised in habeas corpus proceedings, regardless of whether relief is granted or denied. *See Williams v. Fla. Dep't of Cor.,* 391 F. App'x 806, 810 (11th Cir. 2010). Nothing in *Clisby* requires, much less suggests, consideration of claims or arguments raised for the first time in objections. If Petitioner attempts to raise arguments or further factual support for his claim in objections, the court should exercise its broad discretion and refuse to consider the arguments not raised before the magistrate judge in the first instance. *See Williams v. McNeil,* 557 F.3d 1287, 1292 (11th Cir. 2009) (finding no abuse of discretion by the district court in declining to consider timeliness argument that was not presented to the magistrate judge)). This is so because "[P]arties must take before the magistrate, 'not only their best shot but all of the shots.'" *See Borden v. Sec'y of Health & Human Serv.*, 836 F.2d 4, 6 (1st Cir. 1987) (*quoting Singh v. Superintending Sch. Comm. of City of Portland*, 593 F. Supp. 1315, 1318 (D. Me. Sept. 27, 1984)).

Finally, this Court has considered all of Petitioner's arguments in support of his claims for relief. *See Dupree v. Warden,* 715 F.3d 1295, 1299 (11th Cir. 2013) (finding that courts shall review petitioner's claims so long as the claims are presented in a clear and simple language so that the court may not misunderstand it). Petitioner has failed to demonstrate how the state courts' denial of the claims, to the extent they were considered on the merits in the state forum, were contrary to, or the product of an unreasonable application of, clearly established federal law. To the extent a claim was not considered in the state forum, under *de novo* review, the claims do not

---

[4] *Clisby v. Jones*, 960 F.2d 925, 936 (11th Cir. 1992).

warrant relief. Whether a precise argument was specifically addressed herein or in the state forum, all arguments were considered and found to be devoid of merit, even if not discussed in detail.

## VII. Evidentiary Hearing

To the extent Petitioner claims he should be granted an evidentiary hearing on these claims, his argument fails because he has not met the statutory threshold for granting a hearing. The burden is on Petitioner to establish the need for a federal evidentiary hearing. *See Chavez v. Sec'y, Fla. Dep't of Corr.,* 647 F.3d 1057, 1060 (11th Cir. 2011). In reviewing a petition in which a petitioner failed to develop the factual basis for a claim in the state court proceedings, the district court "shall not hold an evidentiary hearing on the claim unless the applicant shows that --(A) the claim relies on--. . .(ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and (B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offenses." 28 U.S.C. § 2254(e)(2). "[A] failure to develop the factual basis of a claim is not established unless there is lack of diligence, or some greater fault, attributable to the prisoner or the prisoner's counsel." *Williams,* 529 U.S. at 432. The Supreme Court has also made clear that, § 2254(e)(2) "continues to have force" and restricts federal courts from considering new evidence where a claim was not adjudicated on the merits. *Cullen,* 563 U.S. at 185 (citing *Williams,* 529 U.S. at 427-29). Petitioner is not entitled to an evidentiary hearing. *See Clark v. Att'y Gen'l, Fla.,* 821 F.3d 1270, 1291 (11th Cir. 2016).

## VIII. Certificate of Appealability

A prisoner seeking to appeal a district courts final order denying his petition for writ of habeas corpus has no absolute entitlement to appeal but must obtain a certificate of appealability ("COA"). *See* 28 U.S.C. § 2253(c)(1); *see also Harbison v. Bell,* 556 U.S. 180, 183 (2009) *(*citing

*Slack v. McDaniel,* 529 U.S. 473, 484-85 (2000); *Wilkinson v. Dotson,* 544 U.S. 74, 78-83 (2005)). This Court should issue a certificate of appealability only if Petitioner makes "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). Where a court has rejected a petitioner's constitutional claims on the merits, a petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong. *See Slack,* 529 U.S. at 484.

Petitioner has not made a substantial showing of the denial of a constitutional right, so no certificate of appealability should issue. If Petitioner does not agree, he may bring this argument to the attention of the Chief District Judge in objections.

### IX. Recommendations

Based upon the foregoing, it is recommended that:

1.    the Amended Petition [ECF No. 22] be DENIED;

2.    final judgment be entered in favor of Respondent;

3.    a certificate of appealability be DENIED; and,

4.    the case CLOSED.

Objections to this Report may be filed with the District Judge within fourteen days of receipt of a copy of the Report. Failure to timely file objections will bar a *de novo* determination by the District Judge of anything in this recommendation and shall constitute a waiver of a party's "right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions." *See* 11th Cir. R. 3-1 (2016); *see also* 28 U.S.C. § 636(b)(1)(C); *Harrigan v. Metro-Dade Police Dep't Station #4,* 977 F.3d 1185, 1191-92 (11th Cir. 2020).

SIGNED this 9th day of June, 2021.

_____

UNITED STATES MAGISTRATE JUDGE

cc:     Phillip Davis, *Pro Se*
        DC#M71094
        South Florida Reception Center-South Unit
        Inmate Mail/Parcels
        13910 NW 41st Street
        Doral, FL 33178